MARVIN, Chief Judge.
In this medical malpractice action, we affirm a judgment based on a jury verdict rejecting the demands of plaintiff, Edward Maroney, who developed blood clots about four weeks after arthroscopic knee surgery. A blood clot in his leg “threw off” smaller blood clots, some of which lodged in Maro-ney’s lungs, causing Maroney to suffer permanent respiratory problems and diminished blood circulation in his leg.
After Maroney was examined six days following the July 24, 1987, surgery by his orthopedic surgeon, who then left on vacation, Maroney made telephone calls to the surgeon’s office on August 5, 8 and 14, and spoke with two of the surgeon’s partner-orthopedists.
Maroney’s cause of action is based on what Maroney contends he told those two doctors and their responses. He testified to the jury that he told them his leg was swollen, painful, feverish and red. The two doctors conceded, as did all other medical witnesses, that they negligently treated and prescribed for Maro-ney if he told them what he testified to the jury.
One doctor had no independent recollection of Maroney’s calls of August 5 and 14 and little or no documentation of them. The other doctor remembered the August 8 conversation, although his recollection differed from Maroney’s. Each doctor testified that he would have insisted that Maroney come to the office for examination if Maroney had said that his leg was swollen, painful, feverish and red.
Thus the pivotal issue about what Maroney said to the doctors is a factual issue, especially in the light of the doctors’ concession that their conduct fell below the professional standard of care if the jury believed Maroney.
By a vote of 9-3, indicating that the factual issue was “close,” the jury resolved the issue against Maroney and in favor of defendants. On appeal, Maroney argues that the jury erred as a matter of law because more weight was given to defendants’ “negative” testimony [that Maroney could not have told them the symptoms he told the jury even though they did not remember specific details of the conversations] rather than to Maroney’s “positive” testimony of the symptoms he said he told the doctors.
Maroney overlooks, however, that the evidentiary rule requiring a trier of fact to give more weight to positive testimony than to negative testimony “only applies when a witnesses] credibility is not at issue.” Dunham v. Dunham, 467 So.2d 555, 559 (La.App. 1st Cir.1985), writ denied.
See also and compare West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979) and Hand v. Reeves, 378 So.2d 1064 (La.App.2d Cir.1979), writ denied. In those cases, the principle that a worker’s compensation claimant’s positive testimony about an unwit-nessed accident, if supported by corroborating circumstances, is sufficient to prove the claim, was noted to apply only in the “absence of circumstances in the record casting suspicion on the reliability of [the plaintiffs] testimony.” West, at p. 1147; Hand, at p. 1066; our brackets.
The credibility and reliability of Maroney’s trial testimony about what he told the defendant doctors by telephone was placed at issue by evidence of a prior inconsistent statement in his deposition about the symptoms he reported in the first call and by inconsistencies between Maroney’s trial testimony about his physical condition August 5 — August 14 and what other doctors, who are not parties to the action, wrote as his “patient history” from what they said he told them on August 17, the day he was hospitalized for treatment *835 of the blood clots. One doctor-witness who saw Maroney on August 17 was the surgeon who practiced with the two defendant doctors. The other doctor-witness was not and is not professionally or otherwise related to the defendants.
While another trier of fact, judge or jury, may have reached a contrary conclusion, the jury’s unfavorable assessment of Maroney’s credibility, however “close” as indicated by the 9-3 verdict, and the jury’s implicit finding that Maroney did not tell the defendant doctors what he claimed to have told them, are reasonable on this record.
If the jury had believed Maroney, the verdict was conceded by defendants. The trial court’s instructions, which are not here complained of, gave the jury the prerogative of either believing or not believing Maroney’s trial testimony. We cannot find the jury was clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State through DOTD, 617 So.2d 880 (La.1993).
We shall discuss the evidence in the record.
DISCUSSION
The defendants originally included Drs. John J. Ferrell and J. Lee Etheredge, who spoke with Maroney by telephone, Dr. Baer Rambach, who performed the surgery, their medical corporation, Orthopaedic Associates, and their malpractice insurer, Medical Protective Insurance Company. The surgeon, Dr. Rambach, was dismissed from the action before trial.
Dr. Rambach performed the arthroscopic surgery to remove bone spurs from Maro-ney’s left knee on July 24,1987, at Physicians & Surgeons Hospital in Shreveport.
Unlike “open” knee surgery, in which a relatively large incision is made to expose the knee joint to the surgeon’s view, arthroscopic surgery is performed by inserting an arthroscope, or a flashing light beam apparatus about the size of an ink pen, and a fluid medium into the knee joint. The arthroscope contains a small camera, which allows the surgeon to view the knee joint through an eyepiece attached to the arthroscope. A magnified image of the invaded joint also appears on a television monitor in the operating room to facilitate the “closed” surgery.
To surgically display and invade the joint, only three small incisions are made in the knee in arthroscopic surgery. Arthroscopic surgery causes less physical trauma and post-surgery immobilization, and presents a much lower risk of developing blood clots, than does open knee surgery.
Maroney’s surgery and his first week of recovery were uneventful. Maroney saw Dr. Rambach on July 30, six days after the surgery, for a follow-up examination. Dr. Ram-bach removed the stitches from Maroney’s knee, replaced his full-length leg cast or splint with a shorter removable splint, and told him to keep weight off of his leg until his next scheduled visit on August 20, about three weeks later. Dr. Rambach noted that Maroney’s progress was “satisfactory” on July 30.
Maroney testified about his condition in the first week after the surgery:
Everything was going pretty good that first week like that. [Dr. Rambach] had me in a long splint that come from my groin on down past my mid calf, and it was a long Velcro type fastener. It’s a covering, and you slip this Velcro thing on there, and that’s the way I had it for the first week. Now, the only thing, it was uncomfortable, and I had some pain with it; that’s true, but it wasn’t anything unusual that I didn’t expect at that time. ... on the 30th of July ... [Dr. Rambach] examined my leg. Everything looked good. I had no problems. There was slight swelling, but — he removed the stitches. He put the little round Bandaids on it, and he ... put a little shorter cast on it ...
[Dr. Rambach] told me to set an appointment for [August] 20th, and he didn’t want any weight-bearing on the leg_ So I was strictly on crutches all the way at that time ...
Maroney testified that on August 1, two days after his July 30 visit to Dr. Rambach, he noticed a “funny feeling ... like a throb” in his left leg while using his crutches. He said he did not pay much attention to it at first, believing it was caused by the recent *836 change of splints on his leg. Maroney said his leg began to swell and to develop pain, redness and fever over the next few days, prompting his first telephone call to Dr. Rambach’s office on August 5. The other calls were made August 8 and 14.

August 5 Call:

In this first call, Maroney spoke only to a female employee, who could not be identified. Asking to see Dr. Rambach, Maroney said he was told that Dr. Rambach was on vacation. Maroney said he then related all of his leg symptoms (swelling, pain, redness, localized fever) to the female employee, who briefly placed the call on hold before returning to tell Maroney that another doctor in the office, Dr. Ferrell, would call in a prescription for Soma Compound, a muscle relaxant, to Maroney’s pharmacy.
Maroney testified:
I said, what is [Soma]? She said, it’s a muscle relaxant. Well, I thought that’s what it was. I thought I needed a muscle relaxant. I mean, I don’t know. I mean, how many people — the average layman out there on the street — would know.
Maroney’s trial testimony about what he told the female employee about the condition of his leg on August 5 (that it was swollen, painful, red and feverish) differs from the testimony he gave in his September 1988 deposition. In the deposition, Maroney said he told the female employee that his leg “was drawing, it was tight and I had a lot of swelling.”
Maroney obtained Soma Compound from his pharmacy on August 5. The pharmacy records show that the prescription was ordered by Dr. Ferrell.
When asked about prescribing Soma, Dr. Ferrell, explaining that he had no independent recollection of prescribing Soma Compound for Maroney on August 5, 1987, testified:
... and I racked my brain to try to remember this — and I asked Cathy Coving-ton, who I thought perhaps was the person who gave me the message on the 5th of August, did you tell me that Mr. So and So — do you remember his call; that someone had pulling behind the knee and needed Soma Compound, and that he had had this medicine before, and it had taken care of the problem? She said, no[,] Mr. Maro-ney has never taken that medicine before. So I really don’t know. That’s the only recollection I have, and apparently it’s not right.
Maroney testified that he had never heard of or taken Soma Compound before August 5, 1987. He said he did not ask for that particular medicine when he called the office on August 5.
Neither Cathy Covington nor any other female employees who might have spoken to Maroney on August 5 were called to testify at trial. The doctors’ office manager, Lois Goodwine, testified that she did not speak to Maroney on that date. Defense counsel concedes that that defendants simply had not been able to identify which employee of defendants Maroney talked to on August 5.
Ms. Goodwine testified that if a patient called the office and reported having pain, swelling, redness and fever in the area that was recently operated on, established office procedure, known to all employees, required the employee receiving such a call to tell the patient to either come to the office right away, if a doctor was in the office, or, if not, to go to the emergency room of the hospital.' Ms. Goodwine’s responsibilities included seeing to it that all employees followed this and other office procedures. She said she had no reason to believe that any employee would fail to obey or follow this office procedure.
Defendants, of course, cannot and do not dispute that Maroney telephoned their office on August 5 and that Dr. Ferrell authorized the prescription for Soma Compound. Defendants contend, however, as Dr. Ferrell testified, that Maroney reported to the female employee only that his leg was drawing up and was tight and swollen. Parenthetically, we note that Maroney testified to this effect in his deposition which was submitted to the medical review panel. A member of that panel, Dr. Mead, testified to the jury that if Maroney reported in the August 5 call what he said he reported in his deposition [that his leg was tight, drawing up and swollen], Dr. Ferrell’s response of simply pre *837 scribing a muscle relaxant without personally talking to Maroney was appropriate. Dr. Mead said, on the other hand, that if Maro-ney reported what he said at trial he reported in the August 5 call [that his leg was swollen, painful, red and feverish], Dr. Ferrell should have talked to him directly to determine whether Maroney should be seen in the office.
Dr. Ferrell testified that if he had been told on August 5 that Maroney was having pain, swelling, redness and fever in his leg after having had arthroscopic surgery 12 days earlier, he would have talked to Maro-ney himself on the telephone and would have asked Maroney to come to the office for a clinical evaluation.

August 8 Call:

Maroney testified that the Soma Compound made him “incoherent” and did not help his leg. He called Dr. Rambaeh’s office again on Saturday, August 8, about 7:00 p.m., and left word with the answering service to have a doctor contact him. Dr. Etheredge returned Maroney’s call about 20 minutes later.
Maroney testified that he told Dr. Ether-edge about his recent surgery and said he had pain from his groin area to his left foot, as well as swelling, discoloration and fever in the leg. Maroney said Dr. Etheredge told him that he had “probably aggravated the leg.” Maroney said he told Dr. Etheredge he had not aggravated his leg and that he explained to Dr. Etheredge that he had followed Dr. Rambach’s instructions not to put any weight on the leg. Maroney said Dr. Etheredge then “insisted” that he had aggravated the leg by overexertion and suggested that he elevate the leg and put an ice pack on his knee, which he did. Maroney said that this gave him only temporary relief, although he continued to use the ice pack intermittently for a week.
Dr. Etheredge had no written record of the August 8 call. He remembered Maroney saying that he had had arthroscopic knee surgery about two weeks earlier and had done well after the surgery but had recently developed some swelling in his leg and his knee. Dr. Etheredge did not recall Maroney reporting any other problems with his leg such as discoloration or fever. Dr. Ether-edge’s assessment of Maroney’s problem, both contemporaneously on August 8 and at trial, was that Maroney’s swelling was probably caused by his having increased his activities, which patients often do about two weeks after knee surgery when the initial soreness subsides and they feel more able to do things.
Maroney denied Dr. Etheredge’s testimony that in the August 8 telephone conversation Dr. Etheredge told Maroney to contact the office again if rest, elevation and ice did not alleviate the swelling.
Maroney testified that he told Dr. Ether-edge that he had spoken to someone in the office on August 5 and that the medication prescribed, Soma Compound, had not done any good. Dr. Etheredge had no independent recollection of Maroney telling him about Soma Compound, but said that if Ma-roney had told him that his leg was red, feverish, swollen and painful, and that another doctor in the office had prescribed Soma Compound a few days earlier, which Maro-ney had taken with no relief of his symptoms, Dr. Etheredge would have asked Maroney to come to the office for an examination.
Maroney’s deposition testimony about the August 8 call was substantially the same as his trial testimony, except that Maroney did not say in his deposition that he told Dr. Etheredge about his August 5 call to the office.
The medical review panel reviewed the conflicting descriptions of the August 8 call in Maroney’s deposition and in Dr. Ether-edge’s affidavit, which was substantially the same as his trial testimony. The panel concluded that Dr. Etheredge’s response to the August 8 call was appropriate if Dr. Ether-edge’s version of what Maroney said was correct, but that Dr. Etheredge should have seen Maroney if Maroney’s version of what he said was correct. The panel deferred the credibility determination to the court.
Maroney testified that the condition of his leg that he reported to Dr. Etheredge on August 8 had
*838 ... never subsided. Temporarily, I had some brief relief from it that evening when I put the ice on it, but later on that night, it got worse, and the next few days it continued to get worse. When it would get worse, that’s when I would throw some more ice on it. I did this for a week.

August 1⅛ Call:

Maroney testified that he spoke to Dr. Ferrell on August 14, telling him that his leg was still swollen, painful, red and feverish, and that he had gotten no relief from either the Soma Compound that Dr. Ferrell had prescribed on August 5 or the ice packs that Dr. Etheredge told him to use on August 8. Maroney said he told Dr. Ferrell that the pain was so bad he could not sleep at night. Maroney testified:
[Dr. Ferrell] said, well maybe you need a sleeping pill. I said, well, I’ve never taken a sleeping pill. He said, well, what kind do you think you ought to have, or something to that effect; and I said, I don’t know, but a ... friend of mine was by the other day, and he said that Doriden was good sleeping medication; if I had some, I’d get a good night[’s] sleep. So I said, well, I don’t have [any] because I’ve never taken sleeping pills before in my life. He said, well, I’ll order you some. So he ordered the prescription [for Doriden] ...
The fact that Dr. Ferrell prescribed Dori-den for Maroney on August 14 is documented in Dr. Ferrell’s records. No other details of the phone call were recorded. Dr. Ferrell testified: “I’m sure I did talk to him. I can’t recall the conversation.” Dr. Ferrell said that if Maroney had told him everything he claimed to have told him by phone on August 14, he would have remembered it, made a record of it and asked Maroney to come in to the office to see him. Dr. Ferrell testified that he has never prescribed Doriden for any patient other than Maroney, and that he has never prescribed sleeping medication for a patient who did not ask for sleeping medication.
Maroney testified that he asked Dr. Ferrell to prescribe Doriden based on his friend’s recommendation, but only after Dr. Ferrell “suggested” that he take a sleeping pill. Maroney said the Doriden helped him sleep better but did not relieve his leg symptoms.
In his deposition, Maroney said he told Dr. Ferrell “of the swelling and the redness and pain” in his leg on August 14. Maroney did not say in his deposition that he told Dr. Ferrell of his prior telephone calls to the office, as he testified at trial.
By affidavit submitted to the medical review panel, Dr. Ferrell stated that the office records showed he authorized the Doriden prescription for Maroney on August 14, and that he had no recollection of speaking to Maroney on that date.
The review panel concluded that if Maro-ney told Dr. Ferrell what he said he told him in his deposition, Dr. Ferrell should have seen him. As with the August 8 call, the panel deferred the factual determination to the court.

Subsequent Events

Maroney saw Dr. Rambach on August 17, 1987, when Dr. Rambach returned from vacation. Dr. Rambach’s office notes of August 17 state:
This patient returned to the office today for followup evaluation because of discomfort he has been having in his left lower extremity. He states that approximately two weeks ago he began experiencing swelling in his left leg and he called Dr. Etheredge who was on call from our group at that time. Dr. Etheredge did advise him to get off weightbearing, elevate the extremity and apply ice. The patient did follow Dr. Etheredge’s instructions and the swelling did dissipate. However, he says he did have recurrence of pain and swelling and again the swelling would go away and discoloration of his leg would clear up. Last night the pain became increasingly more severe with swelling and induration [hardness]....
Dr. Rambach found deep vein phlebitis, or inflammation of the deep (not superficial) veins, in Maroney’s left leg, and suspected that Maroney may also have thrombosis, or a blood clot, in a deep vein in his leg. Dr. Rambach hospitalized Maroney immediately. Tests run in the hospital confirmed the pres *839 ence of a blood clot in Maroney’s leg (deep vein thrombosis) and revealed blood clots in his lungs (pulmonary emboli), which had been “thrown off’ of the clot in his leg. Maroney was given intravenous doses of Heparin, a “blood thinner,” to dissolve the clots and to prevent further clotting. Notwithstanding this medical treatment, Maroney has permanent respiratory problems and problems with the circulation in his leg which prevent him from returning to work as an insurance salesman.
We have quoted Dr. Rambaeh’s office notes of what Maroney told him in the August 17 office visit (that Maroney began having swelling in his leg about two weeks earlier, spoke to Dr. Etheredge and followed his advice to keep weight off the leg, elevate it and apply ice; that the swelling initially dissipated but later recurred, with pain and discoloration, and subsided again before becoming more severe on the night of August 16).
Dr. Rambach recorded substantially the same patient history in the hospital records of Maroney’s admission on August 17. Although the hospital report initially states that Maroney was hospitalized “because of a persistence of pain and swelling in his left Deg] which had its onset about two weeks ago,” it later relates Maroney’s call to Dr. Etheredge and continues:
[Maroney] states that over a couple of days the swelling did get better and his leg began to turn more normal. However, he did have some recurrence of the problem only to notice that it would improve again. However, last night the pain [and swelling] got more severe....
Maroney testified that Dr. Rambach’s office and hospital notes were inaccurate because he did not tell Dr. Rambach that the swelling dissipated after the August 8 call to Dr. Etheredge and later recurred. Maroney steadfastly maintained that the swelling never went away after August 8.
Maroney also said he told Dr. Rambach about the August 5 and 14 calls to the office and the prescriptions for Soma Compound and Doriden. Dr. Rambach did not recall Maroney telling him about any contact with the office other than the August 8 call. He said that if Maroney had related the details of the other two calls, as Maroney described them to the jury, he “would have remembered that in detail” and would have been “extremely upset” with his partners.
Maroney suggested that Dr. Rambach’s office notes of the August 17 visit were not prepared until at least five days later because the office report shows that a copy was sent to Dr. Sebom Woods, Maroney’s internist of many years, who did not see Maroney until August 22. The record shows, however, that Dr. Woods had referred Maroney to Dr. Rambach for evaluation and treatment of his knee problem in June 1987 and was sent a copy of each of Dr. Rambach’s office reports, including those that preceded August 17.
Although blood clots such as Maroney’s are rarely treated surgically, their treatment is more within the expertise of an internist or a general or vascular surgeon than an orthopedic surgeon. When Dr. Rambach hospitalized Maroney on August 17, he sought a consultation from Dr. Keith Mason, a general surgeon. Dr. Mason’s consultation report of August 17 contains this patient history:
This is a 53 year old white male approximately four weeks post extensive arthroscopic knee surgery. He said he did fairly well approximately two weeks postop. He noticed a little bit of swelling and pulling and discomfort in the left [leg] but when the splint came off he did not notice any swelling for about a week and then he began to have rather marked swelling from his foot up to the groin with moderate pain, a lot of swelling and pain in the knee. He said when he got up on it the entire left lower extremity would turn a dar[k] blue. This intended [sic] to improve and he said in fact a couple of days ago the swelling was almost gone but has recurred in the past day or so. Saw Dr. Rambach who admitted him today and he has just arrived and I was consulted to see him and have done so this evening.
Maroney did not deny giving a history to Dr. Mason and did not contend that Dr. Mason obtained any part of the history from Dr. Rambach rather than from Maroney. Maroney did, however, deny telling Dr. Ma *840 son that his leg “tended to improve” and that the swelling was “almost gone a couple of days ago.”
Maroney also claimed that Dr. Mason’s reference to the splint being removed before August 17 was inaccurate, explaining that the [short] splint that Dr. Rambach applied on July 30 was not removed until Maroney saw Dr. Rambach again on August 17. Dr. Mason’s statement appears accurate, however, with reference to the long splint that Maro-ney wore from July 24 to July 30, and is consistent with Maroney’s testimony that the long splint caused some discomfort, as he expected it would.
Maroney and his wife initially brought their malpractice action against Drs. Ram-bach, Ferrell and Etheredge, the hospital where Dr. Rambach performed the knee surgery, and the physical therapist who treated Maroney after the surgery. Plaintiffs dismissed their claims against Dr. Rambach, the hospital and the physical therapist after discovery was completed.

Expert Testimony

Dr. Mead, an orthopedic surgeon who served on the medical review panel, testified that deep vein thrombosis can occur after arthroscopic surgery and can be life-threatening if not treated promptly, but said he had never seen it in any of his patients in his 14 years of private practice. According to the medical literature, less than one percent of patients who have had arthroscopic surgery develop deep vein thrombosis. Dr. Mead testified that the symptoms of deep vein thrombosis in the leg include swelling, pain, fever and hardness in the leg, but said it would be unusual for the patient to have all of those symptoms.
Drs. Etheredge and Rambach testified that swelling is generally the first symptom of deep vein thrombosis, and that pain, warmness and discoloration may also occur in some patients. They agreed with Dr. Mead that there is no standard way that deep vein thrombosis presents itself and that the presentation of symptoms varies from patient to patient. Other than Maroney, Dr. Rambach had never had a patient who developed deep vein thrombosis after arthroscopic knee surgery in 26 years of private practice. Dr. Etheredge had had no such patients in 16 years of private practice. Drs. Rambach and Etheredge testified that pain and swelling commonly occur after surgery for a variety of reasons, and do not necessarily indicate that the patient may have deep vein thrombosis.
Dr. Mead testified that it comports with the applicable standard of care for an orthopedic surgeon to listen to a patient’s complaints by phone and to make the judgment whether the patient needs to be seen for examination based on what the patient tells the doctor. All doctors, including Etheredge and Ferrell, agreed that if a patient reported pain, swelling, warmth and discoloration in his leg after arthroscopic surgery, he should be seen for examination.
We reiterate that the issue before the jury was thus purely factual: What did Maroney say about the condition of his leg in the telephone calls of August 5, 8 and 14, 1987? We have detañed the testimony that bears directly on that issue. The jury also heard the impeaching testimony that we have mentioned. There was other testimony, or perhaps the absence thereof, that could have affected the jury’s assessment of credibility.

Other Testimony

Maroney’s business office is in his home. His wife, stepdaughter and secretary saw him dady or almost dafly following the July 24 surgery until his hospitalization on August 17. Whüe they corroborated his testimony that the pain, swelling and discoloration in his leg did not subside at any time before August 17, their credibility was undermined by their testimony that Maroney’s leg was badly swollen and discolored during the first week after the July 24 surgery. By Maro-ney’s own admission, “everything was going pretty good that first week,” and he had “no problems” and only “slight swelling” when he saw Dr. Rambach on July 30.
Moreover, Mrs. Maroney testified that she was present when her husband spoke to Drs. Ferrell and Etheredge on August 5,8 and 14. She was not asked to, and did not, relate her husband’s end of the telephone conversations on those dates.
*841 CONCLUSION
The jury found that neither Dr. Ferrell nor Dr. Etheredge was negligent in treating Maroney. Plaintiffs argue that the jury verdict is erroneous as a matter of law because the jury gave more weight to the “negative” testimony of the defendants, who simply said they did not recall or have records of much of what Maroney claimed to have told them, than to the “positive, corroborated and uneontradieted” testimony of Ma-roney. They also contend the jury’s implicit rejection of Maroney’s testimony “constituted an unreasonable evaluation of credibility and thus is clear error.”
The record, taken as a whole, does not allow the conclusion that Maroney’s testimony was “corroborated and uncontradicted.” His trial testimony with respect to the August 5 telephone conversation was inconsistent with his deposition testimony about that call. His testimony that he did not tell Dr. Rambach or Dr. Mason some of the things they reported in their written notes of August 17, and that he told Dr. Rambach certain things that were not reflected in Dr. Rambach’s reports, obviously affected the jury’s assessment of Maroney’s credibility with respect to ail three of the calls at issue.
The testimony of Maroney’s wife, stepdaughter and secretary about the condition of his leg during the six days after surgeiy contradicted Maroney’s testimony in material respects. Mrs. Maroney testified she heard Maroney’s end of the telephone conversations, but was not asked to relate what she heard.
The evidence that the jury heard afforded ample grounds for the jury to reasonably question Maroney’s credibility, notwithstanding that his testimony was more “positive” or affirmative with respect to what he did or did not say during each of the phone calls than was defendants’ testimony. Because credibility was put at issue in the material respects mentioned, the jury was not required to give more weight to Maroney’s “positive” testimony than to defendants’ “negative” testimony. Dunham, supra; Hand, supra.
The jury saw and heard Maroney, on the one hand, and Drs. Rambach, Ferrell, Ether-edge and Mason, on the other hand, testify about their dealings with each other respectively as doctor-patient. The testimony on either hand was not so internally inconsistent or facially implausible that it could not have been credited by a reasonable factfinder. The jury had a choice of two legally permissible factual conclusions. The jury’s choice to believe one over the other cannot be found to be clearly wrong, notwithstanding that another trier of fact, whether judge or jury, or even this appellate panel, may have assessed credibility differently. Rosell, supra; Sto-bart, supra.
DECREE
At the cost of plaintiffs, the judgment is AFFIRMED.
APPLICATION FOR REHEARING
Before MARVIN, NORRIS, HIGHTOWER, BROWN and WILLIAMS, JJ.
Rehearing denied.